**Ralph COLEMAN, et al., Plaintiffs,**

v.

**Edmund G. BROWN, Jr., et al., Defendants.**

**No. CIV. S–90–520 LKK/JFM (PC).**

United States District Court, E.D. California.

April 5, 2013.

Edward P. Sangster, Raymond E. Loughrey, Jeffrey L. Bornstein, K & L Gates, LLP, Gay Crosthwait Grunfeld, Lisa Adrienne Ells, Aaron Joseph Fischer, Blake Thompson, Ernest Galvan, Jane E. Kahn, Kenneth M. Walczak, Laura Barbara Boysen–Aragon, Lori Rifkin, Michael Bien, Michael Louis Freedman, Thomas Bengt Nolan, Rosen Bien Galvan and Grunfeld LLP, Claudia B. Center, Legal Aid Society, Amy Whelan, National Center for Lesbian Rights, San Francisco, CA, Fred D. Heather, Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, Los Angeles, CA, Donald Specter, Rebekah B. Evenson, Prison Law Office, Berkeley, CA, for Plaintiff.

Danielle Felice O'Bannon, Rochelle C. East, Kyle Anthony Lewis, Patrick R. McKinney, Jay Craig Russell, Maneesh Sharma, Neah Huynh, Thomas Stuart Patterson, Attorney General's Office for the State of California, Samantha Derin Wolff, Hanson Bridgett, LLP, San Francisco, CA, Paul B. Mello, Hanson Bridgett LLP, Walnut Creek, CA, Debbie Jean Vorous, David Eugene Brice, William H. Downer, Attorney General's Office for the State of California, Department of Justice, Sacramento, CA, Michael R. Capizzi, Law Office

of Michael R. Capizzi, Santa Ana, CA, for Defendants.

Kimberly Hall Barlow, Jones & Mayer, Fullerton, CA.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Plaintiffs are a class of prisoners with serious mental disorders confined in the California Department of Corrections and Rehabilitation ("CDCR"). In 1995, this court found defendants in violation of their Eighth Amendment obligation to provide class members with access to adequate mental health care. *Coleman v. Wilson,* 912 F.Supp. 1282 (E.D.Cal.1995). To remedy the gross systemic failures in the delivery of mental health care, the court appointed a Special Master to work with defendants to develop a plan to remedy the violations and, thereafter, to monitor defendants' implementation of that remedial plan. *See* Order of Reference, filed December 11, 1995 (Dkt. No. 640). That remedial process has been ongoing for over seventeen years.

This matter is before the court on defendants' motion pursuant to 18 U.S.C. § 3626(b) and Fed.R.Civ.P. 60(b)(5) to "terminate all relief in this action, vacate the Court's judgment and orders and dismiss the case." Notice of Motion and

Motion to Terminate Under the Prison Litigation Reform Act [18 U.S.C. § 3626(b) ] and Vacate the Court's Judgement and Orders Under Federal Rule of Civil Procedure 60(b)(5), filed January 7, 2013 ("Notice of Motion") (ECF No. 4275) at 1.[1] The court heard oral argument on the motion on March 27, 2013.

### I. *Motion to Terminate Under 18 U.S.C. § 3626(b)*

Pursuant to 18 U.S.C. § 3626(b), defendants seek termination of all prospective relief and dismissal of this action. Defendants contend that they have remedied the six core constitutional deficiencies identified in the court's 1995 order, that they provide timely access to mental health care, and that they are not deliberately indifferent to the serious needs of class members for mental health care.

### A. *General Legal Standards*

Section 3626(b) of Title 18 of the United States Code, enacted as part of the Prison Litigation Reform Act of 1995 ("PLRA"), provides in relevant part that "prospective relief" ordered in "any civil action with respect to prison conditions" is "terminable upon the motion of any party—2 years after the date the court granted or approved the prospective relief." 18 U.S.C. § 3626(b)(1)(i). However, "[p]rospective

---

1. In 2009, a three-judge court found that overcrowding in California's prison system was the primary cause of the state's failure to remedy ongoing constitutional violations in the delivery of mental health care to prison inmates. That order was affirmed by the United States Supreme Court in 2011. *See Brown v. Plata,* 563 U.S. ——, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011). Pursuant to that order, the state is currently under an order to reduce the state prison population to 137.5% of capacity by the end of this year. As this court has previously noted, it cannot entertain a motion to terminate the relief ordered by the three-judge court or to vacate the population reduction order. *See* Order, filed January 29, 2013 (ECF No. 4316) at 3–4. Defendants have, concurrently with the motion at bar, filed a motion in the three-judge court to vacate or modify the population reduction order. Notice of Motion and Motion to Vacate or Modify Population Reduction order, filed January 7, 2013 (ECF No. 4280). Indeed, since the state has not reached the required population cap, that would appear to dispose of the instant motion. Nonetheless, both plaintiffs and defendant insist that this court can resolve this motion without reference to the three-judge court's order. Given the posture of the parties, the court will proceed to consider the motion.

relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

As the moving party, defendants have the burden of demonstrating "that there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir.2010) (*citing Gilmore v. California*, 220 F.3d 987, 1007–08 (9th Cir.2000)). Plaintiffs do not, as defendants contend, have the burden of proving either of those two elements of defendants' termination motion. "[N]othing in the termination provisions [of 18 U.S.C. § 3626(b) ] can be said to shift the burden of proof from the party seeking to terminate the prospective re-

lief." *Gilmore*, 220 F.3d at 1007. Defendants argue that the court is somehow free to disregard the specific holdings in *Gilmore* and *Graves* that defendants bear the burden of proof on this motion, holdings that are, after all, consistent with the ordinary rule that the party seeking an order bears the burden of proof.[2] It is not.

The record on which this motion is decided must reflect " 'conditions as of the time termination is sought.' " *Gilmore*, 220 F.3d at 1010 (quoting *Benjamin v. Jacobson*, 172 F.3d 144, 166 (2nd Cir. 1999)). "Because the PLRA directs a district court to look to *current conditions*, and because the existing record at the time the motion for termination is filed will often be inadequate for purposes of this determination, the party opposing termination must be given the opportunity to submit additional evidence in an effort to show current and ongoing constitutional violations." *Hadix v. Johnson*, 228 F.3d 662, 671–72 (6th Cir.2000) (emphasis in text) (and cases cited therein) (emphasis in original).

**2.** Defendants cite to *Hallett v. Morgan*, 296 F.3d 732 (9th Cir.2002) and *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir.2001) for the proposition that plaintiffs have the burden of proving that "a current and ongoing federal right violation supports continuing prospective relief" under 18 U.S.C. § 3626(b). Memorandum of Points and Authorities in Support of Motion to Terminate, filed January 7, 2013 ("Termination Motion") (ECF No. 4275–1) at 17. In both *Hallett* and *Mayweathers*, the plaintiffs were the moving parties on the motions at issue. In *Hallett*, the court noted that the " 'general standard for granting prospective relief differs little from the standard set forth in § 3626(b)(2) for terminating prospective relief, or from the standard set forth in § 3626(b)(3) for preserving relief to correct a current and ongoing violation.' " *Id.* at 743–44 (*quoting Gilmore*, 220 F.3d at 1006), but it did not hold that plaintiffs had the burden of proof on a concurrent motion to terminate filed by defendants in that action; instead, the court held that the motion to terminate was mooted by the denial of plaintiffs' motion to

extend jurisdiction. *Id.* at 739. In relevant part the question in *Mayweathers* was whether certain provisions of 18 U.S.C. § 3626 precluded entry of a second preliminary injunction after expiration of a first such injunction. 258 F.3d at 936. In holding that those provisions did not, the court of appeals, in *dicta*, noted that the provision of the statute that provides for expiration of a preliminary injunction after ninety days "simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted" and that "[t]he imposition of this burden conforms with how the PLRA governs termination of final prospective relief." *Id.* (thereinafter quoting 18 U.S.C. § 3626(b)(3)). However much tension this *dicta* might create, it goes without saying that this court is not free to overrule the specific holdings of *Gilmore* and *Graves*. If indeed *Gilmore* and *Graves* are not to be the law in this circuit, it is for *en banc* court of this circuit or the Supreme Court to so hold, and not another panel of the Ninth Circuit, much less a district court.

Defendants' motion, filed January 7, 2013, is supported by two declarations of staff with the CDCR Division of Correctional Health Care Services and declarations from the former Chief of the Health Care Placement Oversight Program, the Acting Statewide Mental Health Deputy Director for CDCR, and the Director of the Facility Planning, Construction and Management Division for the CDCR, as well as two expert reports, one of which is a joint report by three experts and one of which is a solo report. With the exception of evidence of planned and ongoing construction, the evidentiary material tendered by defendants with their motion covers the period through the end of 2012.

On January 18, 2013, pursuant to court order, the Special Master filed his Twenty–Fifth Round Monitoring Report ("Twenty–Fifth Round Report") (ECF No. 4298). It was circulated to the parties on December 28, 2012. It is the Special Master's twenty-fifth report to the court on defendants' compliance with the remedial plan in this action, currently referred to as the Revised Program Guide. It covers the period from May 1, 2012 through September 11, 2012, and is based on visits by the Special Master and his monitoring team to twenty-three prison institutions and document reviews for the remaining institutions. Twenty–Fifth Round Monitoring Report (ECF No. 4298) at 10.[3]

In opposition to defendants' termination motion, plaintiffs filed five expert declarations totaling over 400 pages and accompanied by numerous exhibits, as well as three declarations of counsel with over one hundred additional exhibits. Plaintiffs have also tendered numerous depositions of defendants' declarants, experts, and other witnesses. In reply to plaintiffs' opposition, defendants have filed fifty-four declarations and a declaration of counsel to which are attached numerous additional exhibits.

The PLRA requires that the court "promptly rule on any motion to modify or terminate prospective relief," 18 U.S.C. § 3626(b)(1), and an automatic stay goes into effect not later than ninety days after the motion is filed unless the court timely rules on the motion. *See* 18 U.S.C. § 3626(b)(2). As discussed above, defendants have the burden of proof on the motion at bar, and the motion is resolved with reference to prison conditions at the time the motion is filed. As part of meeting their burden, defendants must first meet their burden of producing evidence that they are in constitutional compliance and that all prospective relief should be terminated.

The reply declarations filed by defendants are apparently intended to raise factual and credibility disputes with plaintiffs' evidence. The task of resolving these dis-

---

**3.** Defendants interposed a number of objections to the Twenty–Fifth Round Monitoring Report and moved to strike or modify several of its provisions. By order filed February 28, 2013, the court overruled defendants' objections as to all but specific institutional objections raised by defendants. Order filed February 28, 2013 (ECF No. 4361). With respect to the latter, the court directed the Special Master to "review those objections in section I(C) [of defendants' objections] that contain specific citation to material provided to him and file any corrections to the Twenty–Fifth Round Monitoring Report as may be required by those specific objections." *Id.* at 11. The Special Master filed a Notice of Corrections on March 19, 2013 (ECF No. 4420). That notice contains the Special Master's response to each of the objections in section I(C) of defendants' objections. The court reserved for further consideration in connection with the motion at bar the questions of whether defendants' suicide prevention efforts are consistent with the requirements of the Eighth Amendment and the weight to be given any particular finding or conclusion of the Special Master as it might relate to issues raised in defendants' termination motion. *Id.* at 8, 11.

putes, especially those involving credibility determinations, would normally be accomplished through an evidentiary hearing. However, as in any motion, the court need not address disputes and credibility issues that are not material and can have no effect on the outcome of the motion.[4] Moreover, in accordance with the allocation of the burdens of production and proof, unless defendants meet their initial burden of production, their motion must be denied. There would, in that case, be no reason to consider the evidence produced by plaintiffs, except to the degree necessary to protect their due process rights, and no need to consider brand new evidence produced In the absence of the required initial showing by defendants, the subsequent disputes are rendered immaterial.

In accordance with the above, except where due process requires otherwise, *see Hadix, supra,* the court has focused on the evidence tendered by defendants with their motion and the Special Master's most recent monitoring report.[5] As discussed

*infra,* this evidence is analyzed with reference to key issues identified in the court's August 30, 2012 order to determine whether there are ongoing constitutional violations in the delivery of mental health care to seriously mentally ill prisoners in California.[6]

## B. *Defendants' Expert Reports*

Before turning to the merits of defendants' motion, the court must address serious concerns raised in connection with two expert reports filed by defendants with their motion. Plaintiffs filed objections to these expert reports alleging, among other things, that the experts conducted "secret" inspections of prisons, and that they "conducted unprofessional and unethical interviews with represented class members outside the presence and without the consent of plaintiffs' counsel." Plaintiffs' corrected objections to termination motion, filed March 15, 2013 ("Objs. to Termination Motion") (ECF No. 4423 at 9–13). Plaintiffs assert that the *ex parte* contact with their clients violated defense counsels' ethical

---

4. Some of the disputes defendants raise here, for example, are marginal to the core issues at bar. *See, e.g.,* Reply Declaration of Bradford M. Sanders, Jr., filed March 22, 2013 (ECF No. 4433) (averring that he was present on the tour with plaintiffs' expert, Dr. Craig Haney, and that the cells Mr. Sanders observed "were clean and no odor was present").

5. In an objection to plaintiffs' post-hearing brief filed April 2, 2013, defendants continue to argue that the Special Master's monitoring report does not identify constitutional deficiencies and "in no way establishes that the State is deliberately indifferent to inmates' serious mental health needs." Defendants' Objections and Response to Pls. Post–Hearing Brief, filed April 2, 2013 ("Objs. To Post–Hearing Brief") (ECF No. 4536) at 13. This court has considered and rejected defendants' argume that the Special Master is not monitoring with reference to a constitutional standard. *See* February 28, 2013 Order (ECF No. 4361) at 3–6.

6. Plaintiffs raise at least two issues in their opposition to defendants' motion that do not fit squarely into areas examined by the court on this motion, including clinical staffing shortages at the Department of State Hospital ("DSH") programs for CDCR inmates, particularly the Salinas Valley Psychiatric Program ("SVPP"); and adequacy of mental health care provided to California's condemned inmates. In addition, plaintiffs challenge the adequacy of medication management, medical record keeping, and problems with screening in CDCR's reception centers and administrative segregation unit. The constraints imposed by the automatic stay provisions of the PLRA preclude this court from undertaking in this order an exhaustive resolution of whether there are ongoing constitutional violations in these or other areas of mental health care delivery. For purposes of this motion and the relief sought by defendants, it is sufficient that ongoing constitutional violations in other areas remain, and that compliance with outstanding orders for prospective relief is required.

obligations under Cal. R. Prof. Conduct 2–100 (the "no-contact" rule).

Of course, since the attorneys for defendants are members of the California Bar, they are bound by the California rules of ethical behavior. Their conduct is not only of concern to the California Bar, however, as this court has "adopted [those rules] as standards of professional conduct in this court." Local Rules of the United States District Court Eastern District of California, 180(e). Since it is accordingly of concern to this court, the court reviews the matter, below.

### 1. The expert reports.

■ The first expert report, signed by Drs. Joel A. Dvoskin, Jacqueline M. Moore and Charles L. Scott, makes clear that the experts planned and conducted *ex parte* interviews with inmates at all thirteen CDCR institutions they visited. Clinical Evaluation of California's Prison Mental Health Services Delivery System by Dyoskin, *et al.*, filed January 7, 2013 ("Clinical Exp. Rpt.") (ECF No. 4275–5) at 18 ("At every facility we visited, we interviewed randomly selected CCCMS inmates"). Those interviews were among the critical pieces of information that formed the "basis" for the experts' report. *Id.* at 10 ("Basis and Reasons for Opinions: ... Site visits (including confidential and private conversations with inmates and staff)"). It is clear that the author of the second expert report, Steve J. Martin, Esq., also spoke with inmates. *See* Ex-cerpts of February 28, 2013 Deposition of Steve J. Martin, filed March 26, 2013 ("Excerpts of Feb. 28, 2013 Martin Depo.") (ECF No. 4522–1) at 70–72.

### 2. The scope of the *ex parte* interviews.

The inmate interviews were not, despite defendants' descriptions of them, simply occasional, unintended by-products of the inspections. Rather, at every facility the defense experts visited, they without fail sought out class members—inmates with serious mental disorders—for their interviews. *See* Clinical Exp. Rpt. (ECF No. 4275–5) at 21 ("At every prison visited with a Mental Health Crisis Bed (MHCB) unit or Correctional Treatment Center serving inmates experiencing mental health crises, a member of our team assessed the program by interviewing randomly selected inmates").[7]

### 3. The reasons for the *ex parte* interviews.

Notwithstanding defendants' descriptions of these interviews, they were not in the nature of pastoral visits to sick patients, in which the experts simply were visiting the inmates because they were "'interested in how you're doing,'" or to "ensure that they were not lacking appropriate care."[8] *See* Resp. to OSC (ECF No. 4499) at 9 and 16. Nor were the visits conducted to enable defendants to find problems in the system "so that the State could resolve them."[9] *See id.* at 8.

---

7. Moreover, the expert report gives the impression that a large number of inmates were interviewed, since it often refers to "the vast majority of individual inmates we interviewed." *See, e.g.,* Clinical Exp. Rep. (ECF No. 4275–5) at 16, 18, 19, 22, 24, 25, 26 and 29. If a majority of the whole is "vast," the whole itself must be large also (unless the experts were simply exaggerating).

8. Defendants describe these contacts as "harmless interactions" and "minimal." De-fendants' Response to Order to Show Cause ("Resp. To OSC"), filed March 25, 2013 (ECF No. 4499) at 8.

9. In more candid moments, defendants come close to admitting that the experts were hired for this termination motion. *See* Resp. to OSC (ECF No. 4499) at 8 (defendants hired the experts to help them "decide whether to bring a termination motion").

To the contrary, the experts were retained expressly for litigation purposes in this case. *See* Exhibit 1 to Declaration of Michael Bien (Excerpts of February 27, 2013 Deposition of Joel Dvoskin, Ph.D), filed March 26, 2013 ("Excerpts of Feb. 27, 2013 Dvoskin Depo.") (ECF No. 4522–1) at 6 (Dvoskin confirms that he was "retained for litigation purposes"), 18 (Ex. 2 to Dvoskin Deposition) (Dvoskin retained for the "defense of the case referenced herein"). As defendants themselves put it, the experts inspected the prison and interviewed the inmates "to fairly and accurately determine whether the State's mental health care system remedied the constitutional deficiencies the Court identified in 1995." Termination Motion (ECF No. 4275–1) at 15.

#### 4. How the interviews were used.

Defendants used the information they gleaned from the inmates against the inmates, in support of their motion to terminate and to vacate the injunction.[10] For example:

> At every facility we visited, we interviewed randomly selected CCCMS inmates. The vast majority of CCCMS inmates interviewed knew the name of their Primary Clinician, how to contact him or her, the name of their psychiatrist, the name of their medication, the purpose of the prescribed medication, and the process for arranging an earlier appointment with their psychiatrist or primary clinician if they wanted one. In

our experience, this is a very unusual finding, and one that speaks to the extensive efforts that have been made to have inmates seen on a timely and predictable basis by their psychiatrist and clinician.

Clinical Exp. Rpt. (ECF No. 4275–5) at 18, 23 ("We conducted randomly selected interviews of CCCMS inmates housed in Administrative Segregation Units (ASU). All CCCMS inmates we identified in ASU were provided appropriate services and periodically assessed to evaluate if they needed a higher level of care"); *see also id.* at 14 ("inmates expressed concerns" about participating in mental health treatment), 19 ("Inmates consistently reported that their Primary Clinician met with them according to the Program Guide parameters"), 31 ("interviews with inmates did not confirm" a medication availability problem complained about by a mental health staff member).[11]

The court concludes that these experts were hired for a litigation purpose—to file this termination motion. The *ex parte* interviews of represented inmates were then used against those inmates, directly, in this motion. The court does not mean to imply that defendants would have filed the motion even if they had interpreted the expert reports as precluding such a motion. However, there is no dispute, from the record before the court, that they were hired in anticipation of filing this motion,

---

10. However, the Court notes that the experts did include some prisoner comments that tended to undermine defendants' motion. *See, e.g.,* Clinical Exp. Rpt. (ECF No. 4275–5) at 12 ("Inmates reported that there were instances where they were forced to choose between their yard time and mental health treatment groups").

11. The "vast majority" of the inmates who were interviewed by defense experts had the same things to report, all of which would be used against them in this motion:

> The vast majority of [CCCMS / SHU [CCCMS] / MHCB / EOPASU / PSU] inmates interviewed knew the name of their Primary Clinician and how to contact him or her if they wished to do so. [The vast majority of EOP / MHCB / EOP–ASU] Inmates also reported that they could request to see their Primary Clinician in addition to the minimum required visit frequency.

*See* ECF No. 4275–5 at 16, 17, 20, 22, 23 and 24.

and that their resulting reports were submitted for this motion.

### 5. Consent to the interviews.

Defendants insinuate that plaintiffs consented to these interviews. Resp. to OSC (ECF No. 4499) at 9. In support, defendants cite a single conversation that Steve Martin, one of the defense experts, had with plaintiffs' counsel Donald Specter: "I believe it was understood that we would be talking to inmates during the site visits, as is the case in any prison tour." *See* Reply Declaration of Steve J. Martin, Filed March 22, 2013 ("Reply Decl. Martin") (ECF No. 4483) ¶ 24.[12] This statement establishes nothing. The no-contact rule, Cal. R. Prof. Conduct 2–100, does not concern itself with what defense counsel's expert now claims to "believe" about what was going on in the mind of plaintiffs' counsel. It requires that defense counsel get the consent of plaintiffs' counsel before conducting these types of interviews.

In any event, plaintiffs' counsel testified in open court to the conversation at issue. Mr. Specter testified that the conversation was principally a casual conversation between him and Dr. Martin. Reporter's Transcript of Proceedings held on March 27, 2013 ("RT") (ECF No. 4538) at pp. 32–34. While the expert mentioned that he would participate in a site inspection, Specter testified, there was no mention of whether plaintiffs' attorneys would be present, or whether he or any other expert would interview inmates.[13] *Id.* This is not even a slender reed upon which to base an assertion that plaintiffs' counsel consented to *ex parte* contacts with their clients. It

is simply culled from thin air. Thus, even if notice were enough, the evidence shows conclusively that such notice was never given.

However, even if the expert had fully disclosed his plans to plaintiffs' counsel, that would not have cured the ethical problem that defense counsel face. Nothing in Rule 2–100 permits counsel (or his expert) to simply inform opposing counsel that he will be talking with a represented party in violation of the Rule. Moreover, the only notice that was even alleged is not enough, since at best it was notice that defense experts would inspect the prisons, not that they would also interview the plaintiff class with no counsel present.[14]

### 6. Applicability of the no-contact rule.

Defendants next assert that the no-contact rule does not apply, or is "relaxed," in the remedial phase of litigation. Resp. to OSC (ECF No. 4499) at 8 and 10. However, they cite no relevant authority for this proposition. Further, they make no mention of the California authority plaintiffs cite, which states that contact by a person retained by counsel for an adverse party is prohibited by Rule 2–100:

> There is no question that communication by the investigator for FFOR & K (indirect communication) with Slowe (a covered employee of a corporate party) violated rule 2–100, *if* FFOR & K knew AT & SF was represented by a lawyer in the Truitt matter at the time of the communication.

---

**12.** Martin's reference to "any prison tour," leaves defendants quite a bit of wiggle room, since it leaves open the possibility that he is referring to prison tours where there is no ongoing litigation, or prison tours where he is accompanied by the lawyers representing the inmates he is going to interview. In short, it does not explain why he thought he could read counsel's mind.

**13.** Defendants' counsel declined to cross-examine Mr. Specter.

**14.** Defendants assert that they notified someone on the Special Master's team that the defense experts would be touring the prison system. Assuming this to be true, it has no legal relevance.

*Truitt v. Superior Court,* 59 Cal.App.4th 1183, 1187–88, 69 Cal.Rptr.2d 558 (2d Dist. 1997) (emphasis in text).

Defendants do cite a 1980 opinion from the Supreme Judicial Court of Massachusetts, and a 1979 law review article in support. *Id.* at 10. The Massachusetts decision has nothing to do with the issue at hand. It addressed an *ex parte* communication made by a *judge. See Perez v. Boston Hous. Auth.,* 379 Mass. 703, 741–42, 400 N.E.2d 1231 (1980) (addressing *ex parte* communications with defendant). The court did not condone the judge's conduct in talking with the defendant housing authority, but noted that it came in the context of the remedial phase of the case "where the judge tends to be more active in such proceedings and to use less formal procedures." *Id.* at 741–42, 400 N.E.2d 1231 ("We do not condone such communications, but the nature of the case suggests some palliation of the misbehavior").[15] The court made no reference to California's no-contact rule, Massachusetts' equivalent rule, nor to any "model" no-contact rule. The court made no reference to any counsel's *ex parte* contact with represented opposing parties. That is because the Massachusetts case has absolutely nothing to do with the no-contact rule, which is the only rule at issue here.

Even if there were authority in support of defendant's argument, and such contacts could be permitted while all sides were working cooperatively to make a consent decree work—and defendants have cited no such authority—that is not the situation here. The results of these *ex parte* interviews are being presented in an adversarial litigation context, against the interest of the interviewees, in an attempt to terminate and vacate the injunction plaintiffs had obtained through protracted litigation against defendants.

### 7. Plaintiffs' contacts with CDCR personnel.

For their remaining responses, defendants assert that plaintiffs engaged in the same conduct.[16] Specifically, they assert that "Plaintiffs' counsel have commonly discussed the substance of this case with Defendants' key decisionmakers without notifying Defendants' counsel or receiving their approval." Resp. to OSC (ECF No. 4499) at 10.

Even if this were a valid defense to defendants' conduct—and it is not—the declarations cited do not even support the charge. In support of this assertion, defendants cite the Reply Declaration of Martin Hoshino, filed March 25, 2013 ("Reply Decl. Hoshino") (ECF No. 4495), the Reply Declaration of Matthew Cate, filed March 25, 2013 ("Reply Decl. Cate") (ECF No. 4497), and the Reply Declaration of Debbie Vorous, filed March 25, 2013 ("Reply Decl. Vorous") (ECF No. 4496).

#### a. Hoshino and Cate Declarations.

The Hoshino declaration does not state or imply that any conversation Hoshino had with plaintiffs' counsel was done without notice to, or the consent of, defendants' counsel. Reply Hoshino Decl. (ECF No. 4495). It does not even address the issue of notice or consent. Moreover, defendants' assertion that these contacts "commonly" occurred, or were "pervasive," is flatly belied by the Hoshino declaration.

---

**15.** The law review article defendants cite has even less to d with this case, as it addresses the possibility that for the remedial phase of a case, a court might call in "an outside expert judge with similar experience elsewhere who, without vote, might sit in on hearings and consult." Frank M. Coffin, *Frontier of Remedies: A Call for Exploration,* 67 Cal. L.Rev. 983, 996 (1979).

**16.** Defendants appear to argue that they figured it was okay for them to violate Rule 2–100 because, they say, plaintiffs did it too. As far as the court is aware, this is not a valid defense for grown-ups.

Hoshino makes clear that he spoke alone with plaintiffs' counsel "two or three" times.[17] *Id.* ¶ 2. These "two or three" times, further, included times Hoshino spoke to plaintiffs' counsel about "*Hecker.*"[18] Thus, it is not clear from the declaration that Hoshino *ever* spoke alone to plaintiffs' counsel about *this* case.

The Cate declaration states that he spoke with plaintiffs' counsel without the presence or "specific" approval of defense counsel. Reply Decl. Cate (ECF No. 4497) ¶ 2. There is no explanation for what "specific" approval refers to, or whether it is distinguished from any "general" or "blanket" approvals that may, or may not, have been given. Cate goes on to state that "to my knowledge," the plaintiffs (who are mentally ill inmates) never sought the consent of defense counsel for the conversation. *Id.* Cate does not, however, set forth why this information would ever be within his knowledge. Accordingly, the fact that he does not know about whether or not consent was given is irrelevant.

In contrast, plaintiffs' counsel has presented a declaration stating, of his own personal knowledge, that of his conversations with CDCR officials, including Hoshino and Cate, "[i]n virtually every case, Benjamin Rice, CDCR General Counsel, or another attorney representing the State or CDCR was present, had been informed or gave permission." Declaration of Michael Bien, filed March 26, 2013 ("Becl. Bien") (ECF No. 4522) ¶ 6.

### b. The Vorous Declaration.

The declaration of Debbie Vorous, a Deputy Attorney General for the State, is troubling. Vorous asserts that during a site inspection of a prison by plaintiffs' expert and plaintiffs' counsel, she "observed" plaintiffs' counsel "talking to prison staff without counsel present." Reply Decl. Vorous (ECF No. 4496) ¶ 4. Vorous never addresses the obvious questions raised by this assertion. For example, how could she have been present at the inspection and "observed" this conduct, without being "present" for purposes of Rule 2–100? Also, if she "observed" this conduct, why did she not make her objection known at the time, when it could have been stopped?

Most troubling about this declaration is the insinuation that plaintiffs' counsel spoke with CDCR staff *apart* from the time Vorous was making her observations. Here, Vorous states that counsel engaged prison staff "without my ability to participate," and "without my presence." *Id.* Vorous does not indicate whether *her* participation or presence was even relevant, since she does not indicate whether *other* defense lawyers were present who did participate or were present. In fact, plaintiffs' counsel states in his declaration that Vorous was not alone on that inspection. Rather, she was accompanied by two other defense lawyers, Katherine Tebrock and Heather McCray. Decl. Bien ¶ 17. Vorous does not state that any conversation with plaintiffs' counsel took place outside of the presence or consent of any of the other two CDCR lawyers who were present. If the other CDCR lawyers were present, then the declaration gives a decidedly false impression.[19]

---

**17.** Meanwhile, Hoshino spoke with plaintiffs' counsel seven or eight times with CDCR counsel present. Reply Decl. Hoshino (ECF No. 4495 ¶ 2.) The remainder of Hoshino's discussion of these conversations fails to distinguish between times when CDCR counsel was present and those when he was not.

**18.** This is apparently a reference to *Hecker v. California Dept. of Corr. and Rehab.*, 2007 WL 836806 (E.D.Cal. Mar. 15, 2007) (Karlton, J.).

**19.** In addition, Vorous does not explain how these matters came her to knowledge such that she can now testify about them, since she says that she did not observe them.

Defendants also seem to complain that plaintiffs' counsel spoke with the inmates, their own clients, with defense counsel not present. Resp. to OSC (ECF No. 4499) at 14. It hardly needs explaining that plaintiffs' counsel and agents are entitled to speak privately with their own clients without violating either Rule 2–100, or any prior order of this court or for that matter, the three-judge court.

### 8. Disposition of defendants' expert reports.

■ In sum, it appears clear that defendants' conduct violated Cal. R. Prof. Conduct 2–100, in having its experts conduct these *ex parte* interviews with represented class members, especially since those interviews were used against the plaintiffs in support of defendants' Termination Motion.

The reports are problematic for an additional reason.

During the time period when defendants' experts were carrying out the prison inspections and inmate interviews that went into their reports, defendants were opposing efforts by plaintiffs, in the three-judge court, to conduct their own discovery. *See* Defendants' Response and Motion To Strike Plaintiffs' "Application for Limited Discovery and Order To Show Cause re Contempt" filed September 5, 2012 ("Response to App. for Limited Discovery") (ECF No. 4234). Plaintiffs' discovery request was for information relating to defendants' efforts to reduce prison overcrowding, the principal cause of the constitutional violations. The court denied the discovery request. Order of three-judge court filed September 7, 2012 (ECF No. 4235). This raises issues of fairness to

plaintiffs, who were denied discovery they could have used for their own expert reports, while defendants were conducting *ex parte* communications for their expert reports.

Given all the above, it is clear that plaintiffs were prejudiced. Defendants' assertion that this conduct was "harmless" is plainly belied by the expert reports themselves, which directly use these tainted interviews against the interviewees in this termination motion. However, the defense experts made no attempt to hide the fact of interviews—after they had occurred. Thus the court can theoretically attempt to discount those portions of the report that appear to be based upon, or influenced by, those statements.[20] This is problematic, however, as the court cannot really know what portions of the report are dependent upon the tainted inmate interviews. Moreover, Dr. Martin's report makes no reference to his interviews with inmates, leaving the court completely unable to identify which portions of his report are tainted.

The court thus believes that it is entirely proper to strike these expert reports and not consider them in connection with this motion. Under normal circumstances, defendants could then correct this problem by retaining untainted experts to re-inspect the prisons, and give their report. However, the PLRA places such a strict time limit on the court's decision-making that this approach is not possible. As a consequence of striking these reports, the court must deny the motion, since defendants' remaining evidence is plainly insufficient to meet their burden to show that

---

**20.** In the absence of unfair advantage, it may be that the possible ethics violations here are best left to be dealt with by the California Bar. *See Continental Ins. Co. v. Superior Court*, 32 Cal.App.4th 94, 111 n. 5, 37 Cal.Rptr.2d 843 (1995).

In addition, the Clerk is directed to deliver a copy of this order to the State Attorney General, to ensure that she is made aware of the conduct.

they have cured the constitutional violations.

In sum, the court finds that defendants violated their professional duty and the plaintiffs were prejudiced thereby. Accordingly, the court strikes the experts' reports, and finds therefore that there is insufficient evidence to support defendants' motion, and thus, denies it.

Nonetheless, the court recognizes that, given the paucity of authority, a reviewing court might find the sanction inappropriate. Accordingly, the court will consider whether, even considering the affidavits, the defendants have made their case.[21] Having done so, the court concludes as an additional ground to deny the motion, that defendants have not borne their burden of proof.

### C. *Standards for Eighth Amendment Violation*

The Eighth Amendment violation in this action is defendants' "severe and unlawful mistreatment" of prisoners with "serious mental disorders," through "grossly inadequate provision of ... mental health care." *Brown v. Plata,* 131 S.Ct. at 1922 & 1923. As the United States Supreme Court noted, the serious and persistent constitutional violation in this action is based on "systemwide deficiencies in the provision of ... mental health care that, taken as a whole, subject ... mentally ill prisoners in California to 'substantial risk of serious harm' and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society." *Id.* at 1925 n. 3 (*quoting Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "For years the ... mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result." *Id.* at 1923.

As recently as August 30, 2012, this court identified several "critically important" goals which are necessary to remedy the Eighth Amendment violation in this action. These include:

- Re-evaluation and updating of CDCR suicide prevention policies and practices;
- Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive necessary higher levels of mental health care, including inpatient care only available from DMH[22];
- Addressing ongoing issues related to placement of EOP (Enhanced Outpatient) inmates in administrative segregation, particularly those housed in such units for over 90 days;
- Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;
- Full implementation of defendants' new mental health staffing plan; and
- Refinement and implementation of MHTS.net to its fullest extent and benefit.[23]

*See* Order, filed August 30, 2012 (ECF No. 4232) at 5 n. 3. These goals, identified by the Special Master two years ago in his Twenty–Second Round Monitoring Report, have been the most recent focus of the extended remedial phase of this litigation.

---

**21.** In any event, under the circumstances, the weight to be given those affidavits is significantly diminished.

**22.** Department of Mental Health, now known as Department of State Hospitals.

**23.** MHTS.net is defendants' internet-based mental health tracking system. Twenty–Fifth Round Report (ECF No. 4298) at 11.

The specific goals track ongoing violations identified by this court in its July 23, 2007 order recommending that a three-judge court be convened to consider a prisoner release order. *See* Order, filed July 23, 2007 (ECF No. 2320) at 6 (ongoing violations include delays in access to mental health crisis beds, acute inpatient care, and intermediate inpatient care; inadequate capture, collection, and analysis of data necessary to long-range planning for adequate delivery of mental health care; unacceptably high staffing vacancies; insufficient program space; and insufficient beds for mentally ill inmates). The specific goals also directly connect to evidence of conditions through August 2008 presented to the three-judge court, which showed serious ongoing constitutional violations in the delivery of mental health care to CDCR inmates, including severe shortages in treatment space, beds, and staffing; inadequate medication management; inadequate medical recordkeeping; and an unacceptably high number of inmate suicides. *See* Order of three-judge court, filed August 4, 2009 (ECF No. 3641) at 60–87.

Finally, several of the goals set forth in the court's August 30, 2012 order (ECF. No. 4232) are tied to constitutional deficiencies described by the United States Supreme Court in its 2011 Opinion affirming the three-judge court's population reduction order, which include:

- A shortage of treatment beds, causing suicidal inmates to be "held for prolonged periods in telephone-booth sized cages without toilets", other inmates to be "held for months in administrative segregation, where they endure harsh and isolated conditions and receive only limited mental health services," and inmates to commit suicide while awaiting treatment. 131 S.Ct. at 1924, 1933.

- "Wait times for mental health care rang[ing] as high as 12 months." *Id.* at 1924.

- A suicide rate that in 2006 "was nearly 80% higher than the national average for prison populations;" and "72.1% of suicides involved 'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable.' " *Id.* at 1924–25 (internal citation omitted). *See also id.* at 1925 n. 2.

- An "absence of timely access to appropriate levels of care at every point in the system." *Id.* at 1931 (quoting 2009 Special Master report).

- Unacceptably high staffing vacancy rates when measured against the state's staffing formula, with expert testimony showing that the staffing need had been significantly underestimated. *Id.* at 1932 & n. 5. Mental health staff "managing far larger caseloads than is appropriate or effective" and a prison psychiatrist reporting that they are "doing about 50% of what we should be doing to be effective." *Id.* at 1932.

- Insufficient space in which to perform "critical tasks and responsibilities" and staff operating out of "makeshift facilities." *Id.* at 1933.

D. *Analysis*

Defendants' motion is premised on their contention that they now have a mental health care delivery system that includes each of the "six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system," *Coleman,* 912 F.Supp. at 1298,[24] and

---

24. "The six components are: (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves

that those components have been adequately implemented.[25] Defendants' motion, which proceeds from the erroneous assumption that plaintiffs bear the burden of proof on a motion to terminate under 18 U.S.C. § 3626(b), is itself woefully inadequate.[26]

The motion also disregards most of the relevant context in which it arises. As a general proposition, proof of an Eighth Amendment violation in the delivery of health care to inmates has two components: an objective component that identifies deficiencies in the provision of inmate health care, and a subjective component that requires a finding that defendants are "deliberately indifferent" to those deficiencies. See Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); see also Wilson v. Seiter, 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Here, the objective component turns generally on whether there are ongoing deficiencies in the delivery of mental health care to class members that subject them to "substantial risk of serious harm,"

see Brown v. Plata, supra. The subjective component is discussed infra.

As this court observed in its 1995 decision, the standards for compliance with the Eighth Amendment must and indeed "can only be developed contextually." Coleman, 912 F.Supp. at 1301. At the time of trial in this matter, among other "woeful inadequacies," defendants did not "have a systematic program for screening and evaluating inmates for mental illness." Id. at 1305. Evidence at trial in 1994 showed that in 1987, the state prison system had identified 2,966 inmates with psychiatric classifications, while studies estimated that there were over 4,000 inmates suffering from serious mental disorders who had not been detected. Id. at 1306 n. 29. By July 1997, a year and a half into the remedial phase of this action, the state prison system had identified 14,293 inmates with serious mental disorders. As of November 2, 2012, there were 32,106 inmates in CDCR's mental health services delivery system. See February 28, 2013 Order (ECF No. 4361) at 6 n. 6.

---

more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide." Id. at 1298 n. 10 (citing Balla v. Idaho State Board of Corrections, 595 F.Supp. 1558, 1577 (D.Idaho 1984)).

25. In their motion, defendants contend that in its 1995 decision this court "did not find that the State's mental health care delivery system was inadequate, but rather that it did not provide 'reasonably speedy' access to care." Termination Motion (ECF No. 4275–1) at 10 (citing Coleman, 912 F.Supp. at 1308). This cramped reading of the foundational order in this case is without merit. See, e.g., Coleman, 912 F.Supp. at 1318 ("Whatever variances exist between the various studies that have

been made, they consistently find a woefully inadequate system of mental health care with all its tragic consequences.")

26. In the analysis that follows, the court frequently relies on the Special Master's reports. This is both sensible and appropriate. Unlike the parties, who have viewpoints colored by their status, the Special Master is responsible only to the court, a responsibility that he has discharged with both care and great propriety. The defendants' initial attempt to deprecate his reports, based upon monetary interests, and subsequently withdrawn see ECF Nos. 4414 and 4353, is both plainly false and unworthy of consideration. Indeed, Dr. Patterson, the Special Master's suicide expert, is leaving his position because of his frustration arising from the defendants' repeated failure to implement his recommendations. See Report on Suicides completed in the California Department of Corrections and Rehabilitation January 1, 2012–June 30, 2012, filed March 13, 2013 ("First Half 2012 Suicide Report") (ECF No. 4376) at 23.

In order to prevail on this motion, defendants must prove that there are no ongoing constitutional violations in the delivery of mental health care to the plaintiff class.[27] This contention must be analyzed with reference to its particular context: delivery of mental health care to over 32,000 mentally ill inmates housed throughout the thirty-three prisons in the California Department of Corrections and Rehabilitation.[28]

As the history of this "complex and intractable constitutional violation" shows, the prospective relief required for the delivery of constitutionally adequate mental health care to over 32,000 mentally ill prison inmates is not "susceptible of simple or straightforward solutions." *Brown v. Plata*, 131 S.Ct. at 1936. *See also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir.2010) ("Prospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law.")

The first remedial order in this action directed defendants to work with the Special Master and his staff to develop and implement plans to remedy the Eighth Amendment violation. *See Coleman*, 912 F.Supp. at 1323–24.[29] Over a decade of effort led to development of the currently operative remedial plan, known as the Revised Program Guide. The Revised Program Guide "represents defendants' considered assessment, made in consultation with the Special Master and his experts, and approved by this court, of what is required to remedy the Eighth Amendment violations identified in this action and to meet their constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates." February 28, 2013 Order (ECF No. 4361) at 3.[30] Over seven years ago, this court ordered defendants to immediately implement all undisputed provisions of the Revised Program Guide.[31] *Id.* at 5–6.

Over the past seventeen years this court has issued over one hundred other sub-

27. Had defendants moved for termination of specific orders, they might have been required to show, in the alternative, that "the relief ordered exceeds what is necessary to correct an ongoing constitutional violation." *Graves*, 623 F.3d at 1048. As plaintiffs observed at the hearing, however, with this motion defendants have "gone for the home run ball." RT (ECF No. 4538) at 26:4–5.

28. Only twenty-eight of California's prisons have a "designated mental health mission." Declaration of Rick Johnson, filed January 7, 2013 ("Decl. Johnson") (ECF No. 4276) at ¶ 5. Inmates at the other five prisons are not without mental health issues; they are, however, transferred to one of the other twenty-eight prisons. *Id.*

29. "The remedial phase of this litigation has been guided by the court's core view that the obligation to comply with the Constitution rests with the defendants and that it is defendants who must choose and implement the mechanisms for meeting that obligation." Order, filed August 15, 2011 (ECF No. 4069) at 5. *See also Coleman*, 912 F.Supp. at 1301 ("The Constitution does not ... prescribe the precise mechanisms for satisfying its mandate

to provide access to adequate mental health care.... [I]n cases challenging conditions of prison confinement, courts must strike a careful balance between identification of constitutional deficiencies and deference to the exercise of the wide discretion enjoyed by prison administrators in the discharge of their duties.")

30. In most of the papers filed recently in this action, defendants have argued that the Special Master is not monitoring to a constitutional standard when he monitors their compliance with the Revised Program Guide. However, at the hearing, defense counsel acknowledge that "[t]he program guide is the remedial plan designed to get the State up to a constitutional level of care ...." RT (ECF No. 4538) at 27:5–7. Thus, the degree to which defendants are complying with the Revised Program Guide is an appropriate way to assess whether defendants are meeting their constitutional obligations.

31. Ninety-five percent of the provisions of the Revised Program Guide were undisputed by the parties when submitted to the court in 2006. *See* Special Master's Report and Rec-

stantive orders to defendants in an ongoing effort to bring the CDCR's mental health care delivery system into compliance with Eighth Amendment standards.[32] Those orders have been focused on core issues including but not limited to staffing, bed planning, suicide prevention, and access to inpatient care. Monitoring of defendants' remedial efforts has been ongoing as well, and the Special Master has filed periodic monitoring reports which both report on defendants' progress and the tasks that remain.[33] *See, e.g.,* Twenty–Second Round Monitoring Report, filed March 9, 2011 (ECF No. 3990) at 461–62; Twenty–Third Round Monitoring Report, filed December 1, 2011 (ECF No. 4124) at 74–77; Twenty–Fourth Round Monitoring Report, filed July 2, 2012 (ECF No. 4205) at 59–66; Twenty–Fifth Round Monitoring Report, (ECF No. 4298) at 16–51. As this court recently reminded defendants, "[b]ecause the Revised Program Guide is grounded in the requirements of the Eighth Amendment as they have been developed in the context of this action, . . ., the Special Master's Report to the court on defendants' compliance with the provisions of the Revised Program Guide is also grounded in the requirements of the Eighth Amendment . . . ." February 28, 2013 order (ECF No. 4361) at 3.

This motion comes before the court focused on a basic structure identified by the court almost two decades ago. Defendants have, through the Revised Program Guide, designed an adequate system for the delivery of mental health care to prison inmates. Their motion fails to address in any meaningful way the more recent specific findings concerning ongoing constitutional violations that have continued to plague adequate implementation of that system. This failure notwithstanding, the court must determine whether defendants have met their burden of proving that those ongoing violations no longer exist.

### 1. *Suicide Prevention*

In 2011, the United States Supreme Court cited California's inmate suicide rate and the percentage of those suicides that involved " 'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable' " as evidence that "[p]risoners in California with serious mental illness do not receive minimal, adequate care." *Brown v. Plata,* 131 S.Ct. at 1924–25. The Court cited the following specific facts: California's 2006 inmate suicide rate was "nearly 80% higher than the national average for prison populations" and that pattern appeared to have continued in 2007; 72.1 percent of the inmate suicides in 2006 involved " 'some measure of inadequate assessment, treat-

---

ommendations on Defendants' Revised Program Guide, filed February 3, 2006 (ECF No. 1749) at 4.

**32.** As of July 2007, prior to the convening of the three-judge court, this court had issued over seventy-seven such orders. *See* July 23, 2007 Order (ECF No. 2320) at 4 & n. 3. Since that time, this court has issued at least thirty-five additional orders directed at adequate design and implementation of necessary remedial measures.

**33.** The Special Master has also observed, correctly, that "[t]he ultimate goal of *Coleman* monitoring is to eventually render itself obsolete as more and more institutions obtain adequate compliance levels and are prepared to assume self-monitoring responsibilities. . . . The hope is that as more and more institutional mental health programs progress toward adequately higher levels of functioning, they too will be shifted to a self-monitoring and reporting status. If their progress proves to be stable and maintainable, the special master's oversight will no longer be needed, and monitoring and review of institutional performance will eventually be turned back over to CDCR." Twenty–Fourth Round Report (ECF No. 4205) at 62.

ment, or intervention, and were therefore most probably foreseeable and/or preventable' ", and that percentage rose to 82% in 2007; the Special Master's report that those " 'numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration,' "; and the Special Master's report that " 'the data for 2010 so far is not showing improvement in suicide prevention.' " *Brown v. Plata*, 131 S.Ct. at 1924–25 & 1925 n. 2.

Despite the fact that current evidence shows that inmate suicides are occurring at virtually the same rate [34] and with virtually the same degree of inadequacies in assessment, treatment and intervention, defendants now seek termination of all relief in this action. The facts show, however, that the rate of inmate suicide is not declining, and more than seventy percent of inmate suicides in California involve significant inadequacies about which defendants have known for years. These facts demonstrate an ongoing violation of the Eighth Amendment rights of members of the plaintiff class.

With respect to suicide prevention, defendants' motion is premised on two basic contentions. First, they contend that "[t]he Eighth Amendment does not mandate that prisons eliminate all suicide risks." Termination Motion (ECF No. 4275) at 27 (citations omitted).[35] Second, they assert that they have "fully implemented and staffed a thorough, standardized program for the identification, treatment, and supervision of inmates at risk for suicide." *Id.* at 28 (case citations omitted). Defendants' first argument misses the mark, and they have not proved the second.

---

**34.** California's inmate suicide rate reached an all-time high of 26.2 inmates per 100,000 in 2005, and was not significantly better in 2006, at 25.1 per 100,000. Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, filed January 25, 2013 ("2011 Suicide Report") (ECF No. 4308) at 7. In 2009, the suicide rate dipped to 15.7 per 100,000, near the national average of 15.2 per 100,00. *Id.* at 7–8. Since then, however, it has climbed back up to 23.72 per 100,000 inmates in 2012. *Id.* at 8. The suicide rate is going in the wrong direction.

The percentage of suicides that involved " 'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable' " has been at or above 72.1 percent since 2006. *See* discussion *infra*.

**35.** In their reply brief, defendants contend that they "successfully prevented 347 attempted suicides" in 2012. They support this assertion with a citation to paragraph 4 of the Reply Declaration of Kathleen Allison, Deputy Director of the Division of Adult Institutions (DAI), Facilities Support, for CDCR and Exhibit A to said declaration. *See* Reply Declaration of Kathleen Allison filed March 22, 2013 (ECF No. 4478) ¶ 4, Ex. A. In part, Ms. Allison avers that "CDCR is able to success-

fully prevent suicides throughout the state through timely and professional clinical intervention but also through good communication and observation by custodial staff. Attached as Exhibit A is a report reflecting that CDCR successfully prevented 347 attempted suicides between January 1, 2012, and December 31, 2012." *Id.* Plaintiffs object to this evidence as new evidence presented for the first time in a reply brief, and to Exhibit A as inadmissible hearsay on the grounds that it has no identifying information and is not authenticated in any way. Plaintiffs' objections to this evidence are well-taken.

The time and place for defendants to submit this declaration, along with properly authenticated exhibits, was in their moving papers, not in their Reply. Defendants' error creates no hardship for them however, as the PLRA appears to permit them to file successive motions to terminate at appropriate times in the future. *See* 18 U.S.C. § 3626(b)(1)(A)(ii). If defendants do so, they will be able to file their papers next time with an awareness of their burden of production and proof. Defendants will also have the benefit of this court's order, which identifies for them at least some of the work that remains to be done to bring the prison's mental health system into constitutional compliance.

To state the obvious, " 'suicide is a serious harm.' " *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir.2012) (internal citation omitted). The suicide rate, and the number of inmate suicides, provide notice to defendants that inmates in their custody have been, and continue to be, suffering the serious harm of suicide. Defendants seek to avoid responsibility for the problem of inmate suicide in California's prisons by making a number of arguments concerning particular statistical methodologies.[36] This analysis misses the point relative to termination of this action. Where, as here, defendants know that they house prison inmates at risk for suicide, they are required to take all reasonable steps to prevent the harm of suicide.

For the past several years, and continuing, over seventy percent of inmate suicides in California have involved " 'at least some degree of inadequacy in assessment, treatment, or intervention,' " also described as "significant indications of inadequate treatment." *See, e.g.*, 2011 Suicide Report (ECF No. 4308) at 3, 28; Report on Suicides Completed in the California Department of Corrections and Rehabilitation in calendar years 2008 and 2009, filed May 15, 2011 (ECF No. 4009) at 9 (82 percent rate in 2007 suicides; 78.4 percent rate in 2008 suicides); Report on Suicides Completed in the California Department of Corrections and Rehabilitation in calendar year 2010, filed November 9, 2011 (ECF No. 4110) at 9–10 (84 percent rate in 2009 suicides; 74 percent rate in 2010). In 2011, 25 of 34 completed suicides, or 73.5% of the suicides involved significant indications of inadequate treatment and "were, therefore, most probably foreseeable or preventable." 2011 Suicide Report (ECF No. 4308) at 3, 10.[37] On March 13, 2013, the Special Master filed Dr. Patterson's

---

**36.** The court is persuaded that suicide rate is the proper method for assessment of suicide trends. As Dr. Patterson suggests in his most recent report, "even assuming that the raw number of suicides was a meaningful metric for evaluating" CDCR's suicide prevention, Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2012–June 30, 2012, filed March 13, 2013 (First Half 2012 Suicide Report) (ECF No. 4376) at 13, those numbers do not help defendants. From 1999 through 2012, 437 inmates have committed suicide in California's prisons. *Id.* Three hundred twenty-six of those suicides were committed in the decade from 2001 to 2010. *Id.* at 13. California's total number of inmate suicides for that period was substantially higher than any other prison system in the United States, including the federal prison system. *Id.* Texas had the next highest number of inmate suicides from 2001–2010, with 248. *Id.*

**37.** Defendants take issue with the findings of the Special Master's suicide expert, Dr. Raymond Patterson, concerning foreseeability or preventability, contending that many of the 25 suicides should not be categorized as "foreseeable and/or preventable." Defendants' Objections to 2011 Suicide Report, filed March 28, 2013 ("Objs. to 2011 Suicide Report") (ECF No. 4526) at 12–31. A review of Dr. Patterson's report, however, indicates that defendants, in their characterization of Dr. Patterson's analysis, failed to acknowledge or address a number of probative facts underlying Dr. Patterson's conclusions.

As an example, defendants objected to Dr. Patterson's assessment of Inmate H, finding that "[Inmate H's] statement to his psychiatrist that he would be going home to Mexico and that his mother was there may very well have been an indication of his intent to go home to Mexico after his death given that his mother was already dead,' " as "retroactive speculation" without a "factual basis for th[e] assertion." Objs. To 2011 Suicide Report (ECF No. 4526) at 17. However, defendants failed to note Dr. Patterson's overt reliance on the fact that a suicide risk evaluation ("SRE") performed at Salinas Valley Psychiatric Program ("SVPP"), before his release to a lower level of care, failed to recognize Inmate H's "serious suicide attempt in 2010" and his "imminent deportation." *See* 2011 Suicide Report (ECF No. 4308) at 107.

Even CDCR's suicide reviewer acknowledged the inadequacies in the SRE performed at SVPP prior to Inmate H's discharge, be-

Report on Suicides Completed in the First Half of 2012. Dr. Patterson reports that for the first half of 2012, the rate climbed to 86.6 percent, or 13 of the 15 suicides. First Half 2012 Suicide Report, filed March 13, 2013 (ECF No. 4376) at 3. Defendants have objected to that report; their objections to that report are still pending.

These "significant indications" continue to fall into an ongoing pattern of repeating inadequacies. In the 2011 Suicide Report, Dr. Patterson's findings as to each of the suicides in question repeatedly include the following (or some combination of the following) systemic inadequacies: (1) failures to refer inmates to higher levels of care when clinically appropriate; (2) failures to

cause it was "not completed with the aid of an interpreter, nor was there more than a cursory record review." *Id.* at 106.

As to Inmate P, defendants contended that Dr. Patterson's finding that Inmate P's suicide was "very likely preventable" lacks a foundation because "[d]espite a challenging clinical presentation, staff continued to provide this inmate with mental health care—immediately prior to his death, his treatment team considered a Keyhea petition, but determined he did not meet the grave disability requirement." Objs. to 2011 Suicide Report (ECF No. 4526)at 19–20. Defendants further argued that "given the staff's efforts to treat this inmate, [it] should not be considered an error in clinical care." *Id.* at 20. Defendants, however, omitted reference to: (1) the inmate's "clear deterioration in mental health functioning," which Dr. Patterson found required that Inmate P be "referred to a higher level of care for more comprehensive and adequate examination"; (2) the inmate's placement in SHU, "despite the requirement that inmates with serious mental illness be placed in a PSU," and with only "minimal consideration that he should have had an evaluation to determine his ability to remain mentally healthy in a SHU"; and (3) the fact that, because a "recently hired psychiatrist inappropriately completed a Removal Chrono after his first meeting with the inmate because the inmate [had] refused medications and treatment," the inmate was "errantly removed from the MHSDS on 2/10/11 and was not seen again until 5/5/11," even though his condition "had clearly deteriorated and continued to do so." 2011 Suicide Report (ECF No. 4308) at 168, 170–71.

The CDCR suicide reviewer in Inmate P's case similarly noted that "it was concerning that the response and decision making of the IDTT with respect to the primary clinician's concerns as to the inmate's increasing symptoms and possible need for a level of care change, especially in the context of no estab-

lished therapeutic relationship and extreme diagnostic uncertainty, was 'concerning'," given that "ample clinical justification was present for a level of care change at IDTT reviews on 6/9/11 and 6/16/11," including "the inmate's deteriorating condition and that his functioning was 'most definitely no longer stable'." *Id.* at 166–67. The CDCR reviewer further found that no SREs "were completed during the inmate's second term of incarceration," despite the inmate's documented history of a suicide attempt in 2006, and that "another SRE should have been completed at some time during the obvious decline in his functioning beginning at the end of May 2011." *Id.* at 167. The reviewer also noted that two areas of concern "ultimately under the control of custody" were "the inmate's single cell status without adequate documentation," given that single cell housing is a risk factor for suicide, and the lack of "out-of-cell time for the inmate to have had regular breaks from SHU confinement," even though "regular breaks from the confinement of a SHU cell is an important stress reducer." *Id.* at 167–68.

As a final example, defendants objected to Dr. Patterson's assessment that Inmate R's suicide was "very likely ... preventable", and argued that Dr. Patterson's finding that the inmate "was discharged from APP to an EOP level of care in a psychiatrically fragile state," lacks a foundation because "[i]mprovement had been noted." (ECF No. 4308) Objs: To 2011 Suicide Report (ECF No. 4526) at 20–21. Defendants, however, failed to address either Dr. Patterson's finding that "the level of improvement d[id] not appear to have justified his return to an EOP level of care" or the fact that "the inmate was discovered in rigor mortis, which raised appropriate questions from the warden regarding monitoring by custody staff." 2011 Suicide Report (ECF No. 4308) at 192.

conduct indicated mental health evaluations and/or assessments; (3) failure to conduct adequate or timely mental health status examinations; (4) failure to carry out basic clinical procedures, such as consultations between mental health and medical providers, conducting UHR/eUHR reviews following discharges from DSH, or obtaining necessary clinical records from the UHR/eUHR; (5) inadequate completion of SRE's; or (6) inadequate emergency responses. 2011 Suicide Report at 9.

As to the suicides that occurred in segregated housing units, Dr. Patterson repeatedly found systemic failures as to (1) documentation and completion of 30–minute welfare checks; (2) completion of the 31–item screen for newly-arriving inmates in administrative segregation; (3) emergency response protocols; and (4) clinical follow-up for inmates discharged from crisis care. *Id.* at 10.

In the First Half of 2012 Suicide Report (ECF No. 4376), Dr. Patterson surveys the suicide prevention measures that he has repeated over the past fifteen years and which defendants have failed to implement. First Half 2012 Suicide Report (ECF No. 4376) at 8–10. These recommendations fall into three areas:

- Ongoing failure in compliance with specific existing requirements, including five-day clinical follow-ups; custody staff adherence to policies and procedures regarding conduct of custody welfare checks and others; and proper supervision of inmates who have histories of increased suicide risk.

- Close clinical monitoring of suicidal inmates; proper and timely referral of decompensating inmates to higher levels of care, particularly mental health crisis beds and inpatient care; appropriate clinical management of suicidal inmates pending referral to higher levels of care, including proper assessment of suicidal risk factors, particularly upon placement in administrative segregation.

- Improvement in necessary emergency response procedures.

*Id.* These recommendations have been repeated periodically since 1999. *See id.* These and other repeatedly identified inadequacies, including "the need for adequate consideration of information available in the medical records of *Coleman* class members" were also described in this court's April 14, 2010 order. Order, filed April 14, 2010 (ECF No. 3836) at 4–6.

Defendants' clinical experts also report on inmate suicides.[38] They report that they "are aware that CDCR has experienced a rate of suicide that is higher than the reported national average for state prisons for the last several years" and they

---

**38.** Much of this part of defendants' clinical expert report i not particularly useful to the issues at bar. Whether or not the Department has or lacks "a passionate commitment to the prevention and elimination of suicides," Clinical Exp. Rpt. (ECF No. 4275–5) at 32, for example, is not relevant to whether defendants have taken all reasonable steps to remedy the identified pattern of deficiencies in suicide prevention. In addition, the suggestion that the Special Master's suicide reports should be provided more timely to defendants, *see Id.* at 36–37, is completely misguided. The report of Dr. Patterson, the Special Master's expert, is based entirely on CDCR's own information and data about inmate suicides. As noted above, Dr. Patterson has reported a pattern of inadequacies for years. This pattern has been known to defendants and can and should have provided a useful framework for defendants to apply in their own internal reviews of inmate suicides, as well as their assessment of required measures going forward. It is, after all, *defendants* who are responsible for timely investigating and reviewing inmate suicides and for implementing procedures to address recurring issues that, if corrected, might have prevented suicides in the past and may prevent them in the future.

report on "statistical overrepresentation" of inmate suicides that occur in the "non-therapeutic" environment of administrative segregation. Clinical Evaluation of California Prison Mental Health Services Delivery System by Dvoskin, et al., filed January 7, 2013 ("Clinical Exp. Rpt.") (ECF No. 4275-5) at 20, 23, 34. They also note

the critical importance of appropriate consideration and accurate documentation of suicide risk factors on the suicide risk evaluation instrument now available. *Id.* at 4, 39 (quality of suicide risk evaluations "remains an area of concern.") These findings are congruent with relevant findings by Dr. Patterson.[39]

**39.** In addition, plaintiffs have presented evidence that in 2010 defendants hired a nationally recognized expert on suicide prevention, Lindsay Hayes. The contract between CDCR and Mr. Hayes recognizes that "[i]n the last ten years the CDCR has experienced an increase in the rate of suicide," that "[f]or most years in the last decade the suicide rate in CDCR has exceeded the national rate of suicide among state prisoners," and that "[r]ecently the CDCR has stumbled in the timeliness of its suicide reviews and the adequacy of the responses to these reviews by institutions and the CDCR as a whole." Exhibit 113 to Declaration of Michael Bien, filed March 15, 2013 (ECF No. 4404) at 2. The contract further provided that Mr. Hayes was hired as a consultant for the express purpose of addressing numerous deficiencies in CDCR's suicide prevention efforts, including "subpar and inadequate" assessments that in turn lead "to poor follow-up trajectories that may contribute to an eventual suicide"; developing assurance that institutional policies and practices reflect department standards and are "consistent across institutions"; and remedying CDCR's inability to "adequately track, monitor, and prevent suicide attempts [which] ha[d] eroded until at the current time [of Hayes' contract] the CDCR has no active database of suicide attempts and no plan to systematically collect data on attempts as a way to better understand who may and who may not attempt and ultimately complete a suicidal act ...." *Id.* In short, CDCR contracted with Lindsay Hayes so that his "experience (more than 25 years) with correctional suicide prevention programs will allow the CDCR to make immediate, short-term, and long-term changes in its suicide prevention program to begin to decrease the overall rate of suicide over the long term ... [and] to implement a more effective suicide prevention policy ...." *Id.*

In August 2011, the first year of the three year contract, Mr. Hayes delivered a report to defendants with his findings and recommendations. *See* Order, filed February 14, 2013

(ECF No. 4341) at 5 (citing Declaration of Lindsay Hayes, filed February 12, 2013 ("Decl. Hayes") (ECF No. 4328) ¶ 5). The "report was written with the explicit intent to provide CDCR with a strategy to reduce inmate suicides within the prison system." Decl. Hayes ¶ 5. Despite explicit contractual provisions for additional services, Mr. Hayes was not contacted by CDCR again except to redact his report in order for certain parts to be provided to the Special Master and plaintiffs' counsel. *See* February 14, 2013 Order (ECF No. 4341) at 5.

In what he now describes as an "unfortunate off-hand remark," in June 2012, Robert Canning, PhD, CDCR's Suicide Prevention and Response Coordinator, told Mr. Hayes in an email that when his "report landed it was not roundly applauded and in fact was buried." Reply Declaration of Robert Canning, Ph.D.), filed March 22, 2013 (ECF No. 4474) at ¶ 4. He now avers that he asked additional questions in the same email because he "wanted to know whether the department could have done anything else to help Mr. Hayes produce a more useful product for the department." *Id.* at ¶ 5. Dr. Canning also avers that CDCR has "analyzed" all of the recommendations in Mr. Hayes' report and "has acted on several of them, including installing hundreds of suicide resistant beds in the Mental Health Crisis Bed Units." *Id.* at ¶ 6; *see also* Reply Declaration of Tim Belavich, filed March 22, 2013 (ECF No. 4472) at ¶¶ 5, 20 (same). No explanation, however, is provided as to why the other recommendations were not adopted.

In fact, the Special Master recommended that defendants develop a plan for installation of suicide resistant beds in mental health crisis bed units in a report and recommendations on defendants' review of their suicide prevention policies filed September 27, 2010. *See* Order, filed September 27, 2010 (ECF No. 3918). Of five recommendations contained in that report, defendants objected only to the recommendation to furnish suicide resistant beds in mental health crisis bed units. *See*

In summary, for over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy those inadequacies. The evidence shows they have not yet done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not.[40] An ongoing constitutional violation therefore remains.

### 2. Administrative Segregation

■ Another "critical goal" centers on treatment of mentally ill inmates in administrative segregation, particularly those whose stays in these units exceed ninety days and those who are placed in administrative segregation for non-disciplinary reasons. These inmates face substantial risk of serious harm, including exacerbation of mental illness and potential increase in suicide risk. See Twenty–Fifth Round (ECF No. 4298) at 36. The evidence before the court shows that a dis-

proportionate number of inmate suicides occur in administrative segregation units. Remedial efforts over the past six years have focused on reducing the length of time EOP inmates remain in administrative segregation and providing appropriate clinical care for EOP inmates housed in such units. See id. at 34–35.

In their motion, defendants contend that they have "developed and implemented procedures for placing and retaining inmates with mental health needs in any administrative segregation or security housing unit." Termination Motion (ECF No. 4275-1) at 29. Defendants contend that while mentally ill inmates are in these units their mental health needs are "being appropriately met" and that there is no evidence to the contrary. Id. This contention is not supported by defendants' own experts.

Defendants' experts describe the "environment of administrative segregation" as "generally non-therapeutic." Clinical Exp. Rpt. (ECF No. 4275–5) at 20. They recommend that housing inmates with serious mental disorders be "as brief as possible and as rare as possible." Id. at 25.[41] Defendants' experts noted the "statistical

Order, filed November 18, 2010 (ECF No. 3954) at 3. Defendants' objections were overruled on July 21, 2011 (ECF No. 4044) and defendants were ordered to file with the court and submit to the Special Master a plan to furnish suicide resistant beds. Order, filed July 21, 2011 (ECF No. 4044) at 8. While this court is refraining from making credibility assessments in connection with this alternative disposition of defendants' motion, defendants' representation concerning the implementation of this recommendation by Mr. Hayes would appear to ignore some relevant history with respect to the provision of suicide resistant beds in their mental health crisis bed units.

40. For example, in opposition to defendants' motion, plaintiffs present evidence that on January 19, 2013, Shama Chaiken, the Chief of Mental Health at California State Prison–Sacramento (SAC) and other prison mental health chiefs received an email from the CDCR Supervisor of the Suicide Risk Evalua-

tion Mentor Program, Kathleen O'Meara. It reads: "Suicide remains 'th low hanging fruit for coleman. Please MAKE SURE your SRE Mentor Program is up and running." Exhibit 61 to Declaration of Michael Bien, filed March 15, 2013 ("Ex. 61 to Decl. Bien") (ECF No. 4402) at 3. Dr. Chaiken replied on the same day: "OK—This has been on the back burner at SAC, but we'll come up with an implementation plan next week." Id. Ms. O'Meara requested that the plan be forwarded "upon completion," to which Shama Chaiken replied that she and the person taking over the program at SAC "want to go through the mentoring so we understand what is required, and then Catherine will likely take some supervisors through the process so we will have a team of mentors." Id. Ms. O'Meara's response was: "Call me .... I'm floored by what you're telling me." Id.

41. They also "applaud CDCR's efforts to expedite the transfer of EOP inmates out of

overrepresentation of completed suicides" in administrative segregation units when compared to other housing units, accordingly, recommend that "placement of inmates who require an EOP level of care be housed in Administrative Segregation Units only when absolutely necessary for the safety of staff or other inmates, and only for as long as it absolutely necessary." *Id.* at 23. They also reported finding, at two prisons, "some inmates waiting for EOP Special Needs Yard beds and reportedly housed in an Administrative Segregation Unit for their own protection; not because they posed a danger to others." *Id.* at 21.[42] They recommended that such inmates be "placed in the front of any waiting list." *Id.*

In the Twenty–Fifth Round Report, the Special Master reported an ongoing need for improvement in treatment provided to inmates needing an Enhanced Outpatient (EOP) level of care who are placed into administrative segregation units. *See* Twenty–Fifth Round Report (ECF No. 4298) at 34–38. The Special Master reports an "elevated proportion of inmates in administrative segregation who are mentally ill" and describes a series of issues to be addressed, including

> reduction of risks of .decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treat-

ment/mitigation of harshness of conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation.

*Id.* at 38. The Special Master's findings identify remaining issues that are also identified by defendants' experts. These issues, until remedied, mean that seriously mentally ill inmates placed in administrative segregation units continued to face a substantial risk of harm.

### 3. *Transfer to Higher Levels of Care*

Evidence of ongoing constitutional violations in this action has included evidence of "an 'absence of timely access to appropriate levels of care at every point in the system.'" *Brown v. Plata,* 131 S.Ct. at 1931 (quoting report filed by Special Master in July 2009). Delays in access to inpatient care have been shown by evidence in this action dating back to 1993, and serious delays have existed until as recently as last year. *See* Order, filed July 22, 2011 (ECF No. 4045), *passim* (discussing history of delays in access to inpatient care and ordering specific relief); Order, filed July 13, 2012 (ECF No. 4214) at 1 (commending "the parties and the Special Master for the remarkable accomplishments to date in addressing the problems in access to inpatient mental health care.")[43] Defendants assert they have

administrative segregation" but they don't describe what those efforts are. *Id.* at 20.

**42.** Defendants' experts describe a single case at California Medical Facility (CMF) as having "no systemic implications" but they reiterate their recommendation that such inmates be "moved to the top of the transfer list." *Id.* at 24.

**43.** Significant events in the long history of efforts to remedy ongoing delays in timely access to care, particularly inpatient care, are described by the Special Master in his Twenty–Fifth Round Report. *See* Twenty–Fifth Round Report (ECF No. 4298) at 25–31.

Among other things, that history shows the interrelationship between bed shortages and failures to identify and treat inmates in need of higher levels of care. An insufficient number of beds has led to long wait lists for inpatient care; the two assessments described by the Special Master, the Unidentified Needs Assessment (UNA). completed in March 2005 and the 2009 Mental Health Assessment and Referral Project (MHARP) each, respectively, revealed hundreds of inmates in need of higher levels of care who had not been identified or referred for such care. *See* Special Master's Report on Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Wait Lists, filed June 13, 2011 (ECF No.

remedied this violation. Termination Motion (ECF No. 4275–1) at 17–18.

In assessing defendants' constitutional compliance, the relevant requirement is defendants' constitutional obligation to provide "a system of *ready* access to *adequate* [mental health] care." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982) (emphasis added), abrogated in part on other grounds by *Sandin v. Conner*, 515 U.S. 472, 481–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Defendants' mental health care delivery system provides four levels of mental health care and is designed to provide inmates at all custody levels both inpatient and outpatient mental health care. *See* Decl. Johnson (ECF No. 4276) ¶¶ 4–12; Declaration of Tim Belavich, filed January 7, 2013 ("Decl. Belavich") (ECF No. 4277) ¶¶ 6–8. Defendants' remedial plan, the Revised Program Guide, contains "the time frames which CDCR must meet for the transfer of MHSDS inpatient-patients between levels of care, whether within the same institution or to another institution", set out in a chart. Revised Program Guide, 2009 Revision,[44] at 12–1–14, 12–1–16. The time frames in the Revised Program Guide represent defendants' considered assessment of what is sufficiently "ready access" to each level of care.

### a. *Inpatient Beds*

■ Citing to this court's July 13, 2012 order (ECF No. 4214), defendants contend that "[b]y July 2012, the State had successfully guaranteed timely access to inpatient mental health care for all class members needing hospitalization." Termination Motion at 17. Defendants also present evidence that "[a]s of December 17, 2012, there were no inmates waiting for acute or inpatient care" past the timelines set in the Revised Program Guide. Johnson Decl. at ¶ 13. Thirteen inmates were waiting for acute inpatient care but none had been waiting more than ten days. *Id.* There were forty-five inmates waiting for admission to intermediate hospital care, "the majority pending two weeks or less." *Id.*

In the Twenty–Fifth Round Monitoring Report, the Special Master reported in relevant part that by the end of June 2012, "defendants had substantially implemented the objectives" of a sustainable self-monitoring process developed over the preceding year. Twenty–Fifth Round Monitoring Report at 31. The objectives of that self-monitoring process are "to timely identify, refer, and transfer inmate-patients needing DSH inpatient care and to internally monitor and improve the process." *Id.* The July 12, 2012 completion of a project at California Medical Facility (CMF) permitted placement of high-custody inmates waiting for inpatient care in hospital beds, "a milestone in the process of eliminating the intermediate care wait list." *Id.* The Special Master reports that "[f]rom an overall perspective, identifica-

4020) (in March 2005 defendants reported to the Special Master that 400 inmates had been identified "who otherwise would not have been referred to higher levels of care"); Ex. B to Declaration of Jane E. Kahn in Support of Plaintiffs' Status Conference Statement Regarding Defendants' Initial Report on the Mental Health Assessment and Referral Project (MHARP) and the ICF Pilot Program, filed March 24, 2010 (ECF No. 3825–1) at 7 (As result of MHARP 987 inmates "were either recommended for referral by the ... assessment teams or directly referred by the

institutions.") The wait list for inpatient care in early 2010 was 574 male inmates waiting for intermediate inpatient care and 64 male inmates waiting for acute care. Twenty–Fifth Round Report (ECF No. 4298) at 33. The history set forth by the Special Master also shows how relatively recent defendants' gains in access to inpatient care are. *See id.* at 25–33.

44. www.cdcr.ca.gov/dchcs/docs/mental %20health%20program[uide].pdf.

tion, referral and transfer of inmates in need of inpatient care have improved greatly in the past two years." *Id.* at 32–33. He confirmed that there were thirty-six inmates accepted to inpatient care who had been waiting less than thirty days, one whose admission had been delayed because of a scheduled hearing, and three waiting assessment to determine whether they were competent to stand trial who had been waiting more than thirty days. *Id.* at 33. As he reports, this is a "vast improvement over the wait lists in early 2010, when there were 574 male inmates awaiting transfer to intermediate inpatient care, and 64 male inmates awaiting transfer to acute care." *Id.*

The gains in timely and adequate access to inpatient care are new.[45] And they are not complete. Access to hospital care begins at the institutional level with a process for referral to inpatient care. As the Special Master explains, timely and complete referrals at the institutional level are "an important aspect of the entire process of moving seriously mentally ill patients to inpatient care." *Id.* The Special Master reports that "a number of institutions' levels of performance continued to lag on the basic elements" of the process for referring inmates to inpatient care. *Id.* at 33. For example, one-third of the men's prisons do not adequately track referrals to higher levels of care, and over two-thirds of prisons do not timely complete the necessary referral packets. *Id.* In addition, "[o]nce inmates were accepted at DSH

programs, transfers to both acute level care and intermediate inpatient care continued to be slow at a number of institutions." *Id. See also* Twenty–Fifth Round Monitoring Report at 72–75 (discussing referral and transfer issues at institutional level).

The substantial improvement in access to inpatient care cannot be gainsaid. Defendants have made significant progress in remedying one of the most tragic failures in the delivery of mental health care—the unconscionable delays in access to inpatient care and the sequelae therefrom, including periodic substantial decline in clinical referrals to necessary hospital care. As noted above, however, the gains are new and work remains. The gains that have been made, however significant, do not entitle defendants to termination of all relief in this action.

### b. *Mental Health Crisis Beds*

Mental health crisis beds (MHCBs) are for inmates who are suffering "[M]arked Impairment and Dysfunction in most areas ... requiring 24–hour nursing care" and/or dangerous to others as a result of a serious mental illness or to themselves for any reason. Revised Program Guide, 2009 Revision, 12–1–8. They are also used for "short-term inpatient care for seriously mentally disordered inmate-patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care." *Id.* They are short-term care units, with in-

---

**45.** They are also challenged, at least in part, by plaintiffs who present evidence that defendants have "tried to disguise the inpatient waitlist" by starting an inmate's wait time on the date the inmate is accepted for hospital care by DSH, rather than the date the inmate is referred for such care. Corrected Plaintiffs' Opposition to defendants' Motion to Terminate Under the PLRA and to Vacate under Rule 60(b)(5) (ECF No. 4422) at 44. Plaintiffs also challenge Mr. Johnson's averment that there was no wait list for inpatient care,

pointing to his deposition testimony that he had relied on a summary from DSH and had not reviewed the actual bed utilization report. *Id.* Plaintiffs contend review of that report "shows that the majority of the patients currently housed in the DSH programs waited longer than transfer time frames to get to those inpatient programs" and that inmates waiting in December 2012 and January 2013 had been waiting longer than the relevant time frames. *Id.* (citing, *inter alia*, Ex. 73 to Bien Decl.) (ECF No. 4402) at 228–229.

mates discharged within ten days unless administrative approval is given for a longer stay. *Id.*

In support of their motion, defendants present evidence that there were no inmates waiting for placement in a mental health crisis bed as of December 17, 2012. Decl. Johnson (ECF No. 4276) at ¶ 9. This statement, however true, obscures the relevant issue with respect to access to mental health crisis care. While it may be technically true that the inmates are not waiting for a crisis bed, that is only because they are being housed in facilities totally inappropriate for a person in need of a mental health crisis bed.

Defendants do not presently have a sufficient number of mental health crisis beds (MHCBs) to meet the need for such beds. Twenty–Fifth Round Report (ECF No. 4298) at 21. For an extended period of time, inmates in need of mental health crisis care have been placed in a variety of alternative holding areas when MHCBs are unavailable. During the twenty-fifth round monitoring period, only eight prisons with mental health crisis beds had sufficient beds to meet the need. *Id.* at 76. Ten other prisons had insufficient beds and had to use "alternative holding areas" to monitor inmates in need of mental health crisis bed care. *Id.* During the monitoring period, 722 inmates at California State Prison–Sacramento (CSP/Sac) in need of crisis bed care were placed in "medical OHU beds, ZZ cells, and contraband cells" when crisis beds were unavailable. *Id.* Two hundred-sixty nine of these inmates were eventually transferred to MHCBs. *Id.* Eight other prisons also placed numerous inmates in need of crisis care in these "alternative holding areas." *Id.* Lengths of stay ranged from four hours to four to five days. *Id.* Folsom Prison used "eight alternative holding cells in administrative segregation" to monitor

inmates in need of mental health crisis beds "via continuous watch." *Id.* at 77.

On June 15, 2012, the court ordered defendants to continue to work with the Special Master to incorporate the number of inmates placed in alternative housing areas into their future planning for necessary MHCBs and to meet any increased need for such beds identified by this process. Order, filed June 15, 2012 (ECF No. 4199) at 2. In the Twenty–Fifth Round Report, the Special Master reports that it appears defendants have now planned for sufficient MHCBs. Twenty–Fifth Round Report (ECF No. 4298) at 21. "Work on the provision of those beds is continuing." *Id.*

Until the necessary number of mental health crisis beds are complete and operational, mentally ill inmates in need of this care are held in conditions that defendants have now agreed should not be used to house inmates in need of crisis care. This aspect of the Eighth Amendment violation is ongoing.

#### 4. *Treatment Space/Beds*

■ Shortages in treatment space and access to beds at each level of mental health care have plagued the entire remedial phase of this action. Defendants identify several ongoing construction projects in their termination motion, some of which are at very preliminary stages, yet they seek termination of this action before critically important construction is complete. *See* Termination Motion (ECF No. 4275–1) at 12–13. Those projects are underway pursuant to a bed plan that took at least four attempts and numerous court orders to complete so that defendants had *a plan* for sufficient beds and treatment space at each level of the mental health care delivery system. Creation of that plan for a constitutionally adequate number of beds has taken years. The construction required by the bed plan is ongoing. Until all necessary projects are complete, the

state's prison system is operating with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of beds necessary for adequate care. That is an ongoing constitutional violation that must be remedied.

### 5. *Staffing*

■ Inadequate staffing has plagued the delivery of mental health care in CDCR prisons for decades, and chronic understaffing and high vacancy rates in mental health staff positions are evidence of an ongoing Eighth Amendment violation. *See Brown v. Plata*, 131 S.Ct. at 1926, 1932–33 & n. 5. In their motion, defendants acknowledge that the Constitution "requires the employment of 'trained mental health professionals ... in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" Termination Motion (ECF No. 4275–1) at 24 (quoting *Ruiz v. Estelle*, 503 F.Supp. 1265, 1339 (S.D.Tex.1980)). Defendants acknowledge ongoing mental health staffing vacancies, but contend that these vacancies do not "significantly impair the level of care being provided to inmates, and that 'the clinical care itself places CDCR in the upper echelon of state prison mental health systems.'" Termination Motion (ECF No. 4275–1) at 25 (quoting Clinical Exp. Rpt. (ECF No. 4275–5) at 1, 14; and citing Twenty–Fourth Round Report (ECF No. 4205) at 41).

In 2009, pursuant to this court's June 18, 2009 Order (ECF No. 3613), defendants developed a staffing allocation plan (ECF No. 3693) (2009 Staffing Plan). Defendants' 2009 Staffing Plan sets forth how defendants' mental health delivery system is to be staffed. *See* Declaration of Diana

Toche, filed January 7, 2013 ("Decl. Toche") (ECF No. 4275–3) ¶ 6. The 2009 Staffing Plan is driven by ratios of clinical and support staff to inmate population at each level of the mental health delivery system. *See* 2009 Staffing Plan (ECF No. 3693), *passim*. Defendants' experts opine that the 2009 Staffing Plan "will provide adequate resources to meet the mental health needs of inmates in a reasonable manner and within the standard of care." Clinical Exp. Rpt. (ECF No. 4275–5) at 14. That opinion comports with defendants' representation to the California Legislature that full implementation of that plan was necessary.

Prior to development of defendants' 2009 Staffing Plan, expert testimony showed that the state had underestimated its mental health staffing needs. *See Brown v. Plata*, 131 S.Ct. at 1932 n. 5. After submitting the 2009 Staffing Plan to this court, defendants, at the end of 2009, submitted a budget change proposal to the California Legislature to "fully implement" the staffing model described in the 2009 Staffing Plan. Exhibit K to Declaration of Jane E. Kahn in Support of Plaintiffs' Response to Defendants' Motion to Strike or Modify Portions of the Twenty–Fifth Round Monitoring Report of the Special Master, filed February 11, 2013 (Ex. K to Decl. Kahn) (ECF No. 4325) at 93. The budget change proposal described the critical flaws in defendants' prior staffing model, and represented that the 2009 Staffing Plan "identifies appropriate staffing levels to meet constitutional standards ...." *Id.* at 95.[46]

With their motion, defendants present evidence that for Fiscal Year 2012/2013, the ratios in the 2009 Staffing Plan require 2268.26 staff positions. Decl. Toche (ECF

---

46. It also asserts that the plan would allow defendants to "provide the quantity and quality of Resources needed to achieve compliance with policies and procedures contained in the ... Revised Program Guide" and was "consistent with models for program staffing in similarly situated models in other states." Ex. K to Decl. Kahn at 98.

No. 4275–3) ¶ 6.[47] Defendants admit that as of the end of November 2012, there were 653.86 mental health staffing vacancies. *Id.* at ¶ 8. This represents a total vacancy rate of approximately 29 percent. The cited declaration does not provide specific vacancy rates by staff classification or mental health delivery service level. Thus, there is no way to tell from defendants' motion what the vacancy rate is for mental health providers.

The Special Master, on the other hand, provided the parties and the court with a detailed report of staffing vacancies in his his Twenty–Fifth Round Report. That report covers much of the same time period, May 1 2012 through September 11, 2012, as defendants' declaration. (ECF No. 4298) at 10. The Special Master reports a vacancy rate among staff psychiatrists of 42 percent, with use of contract psychiatrists reducing that rate to 26 percent. *Id.* at 45. The vacancy rate among staff psychologists and social workers was reported at 21 and 24 percent, respectively. *Id.* at 45–46. Contractors reduced those vacancy rates to 17 and 20 percent, respectively. *Id.*

The 29% staffing vacancy rate at the end of November 2012 attested to by defendants is higher than that reported by the Special Master in his Twenty–Fifth Round Report. The Special Master reported an overall vacancy rate of 21.2 percent, lowered only marginally to 18.3 percent through use of contractors. Twenty–

Fifth Round Report (ECF No. 4298) at 44. Significantly, the Special Master reported that "[t]his was a reversal of the trend of consistently declining vacancy rates across preceding monitoring periods. It signaled a significant departure from the overall mental health vacancy rate of 14 percent and the overall functional vacancy rate of 7.7 percent that was reported for the twenty-third monitoring period", from October 2010 to April 2011, "the most recent review period in which all institutions were audited." *Id.* at 44.

Altogether, the vacancy rates in these three clinical categories significantly exceed the 10 percent maximum vacancy rate in those positions required by this court's June 12, 2002 Order (ECF No. 1383). *See* Twenty–Fifth Round Report (ECF No. 4298) at 44. The Special Master concluded,

> Clinical staff are the conduit for the delivery of care to patients. Without necessary staff, the chain of care is broken and patients are not treated. This sort of breakdown manifests itself in, among other things, inadequate attendance by required clinical staff at IDTT meetings, delays in clinical contacts, and untimely completion of referrals for inmates who require higher levels of care, all of which undermine progress that has been made with the delivery of care.

*Id.* at 47.[48] The Special Master's expert on suicide prevention, Dr. Patterson, also reported that the lack of adequate mental

47. Funding for FY 2012/2013 covers "nearly 100%" of those positions. Decl. Toche at ¶ 6. To provide salary savings, the state is not funding "approximately two non-critical positions at each institution ... includ[ing]: (1) a second Chief Psychologist, except at Pelican Bay State Prison; (2) the Correctional Health Services Administrator II; and (3) one Clinical Psychologist at the five prisons without designated mental health programs." *Id.*

48. The Special Master reported on vacancies in the following staffing classifications. All of

the staffing classifications are required by the Revised Program Guide and provided for in defendants' 2009 Staffing Plan.
- Chief Psychiatrists: 33 percent vacancy rate in 18 allocated positions; no contract coverage for any vacant position. Six institutions "operated without chief psychiatrists," including CSP/LAC, which was without a chief psychiatrist for the fourth consecutive monitoring period.
- Senior Psychiatrists: 50 percent vacancy rate; nine institutions filled all positions; one institution had one of three positions

health staff "continues to exacerbate" the inadequacies in assessment, treatment and interventions that were present in 73.5% of the inmate suicides committed in CDCR prisons in 2011. 2011 Suicide Report (ECF No. 4308) at 16. CDCR suicide reviews have also identified the impact of staffing shortages in their reviews of several inmate suicides in 2011 and 2012. *See*

> filled; nine institutions had 100 percent vacancy rates; no vacancies covered by contractors.
> - Staff Psychiatrists: 42 percent vacancy rate; use of contractors reduced functional vacancy rate to 26 percent; including contract coverage, six institutions had vacancy rates of 10% or less; seventeen institutions had vacancy rates from 11 percent to 50 percent; seven institutions had vacancy rates from 54 percent to 83 percent, and four institutions "did not fill any of their line psychiatry allocations with full-time psychiatrists."
> - Chief Psychologists: 7 percent vacancy rate; 26 of 28 positions filled; no contract coverage for remaining two positions.
> - Senior Psychologists: 39 percent vacancy rate; no contractors used to cover vacancies; seven institutions were filled or nearly filled; fifteen institutions had vacancy rates from 20 to 50 percent; six institutions had vacancy rates from 60 percent to 75 percent; and four institutions, each with one position, had not filled the position.
> - Staff Psychologists: 21 percent vacancy rate; use of contractors reduced functional vacancy rate to 17 percent. Fifteen institutions had all their positions or a vacancy rate under 10 percent either through filled positions or use of contractors; eleven institutions had vacancy rates from 13 percent to 30 percent; and six institutions had vacancy rates from 31 percent to 65 percent.
> - Social Workers: 24 percent vacancy rate; use of contractors made functional vacancy rate 20 percent; five institutions filled all their positions; two had functional vacancy rates below ten percent; ten institutions had vacancy rates from 11 to 29 percent; nine institutions had vacancy rates from 30 percent to 59 percent; and two institutions had vacancy rates of 67 percent and 69 percent, respectively.

Decl. Kahn (ECF No. 4325) ¶¶ 6f, g, h, 9c.[49]

Despite this, defendants assert, in conclusory fashion, that notwithstanding these vacancies, "[a]dequate numbers of mental health professionals and administrators" are providing class member inmates with "access to high-quality mental health care." Decl. Toche at ¶ 10.[50] This conclu-

> - Psych techs: 6.5 percent vacancy rate; functional vacancy rate of five percent.
> - Recreational therapists: 26 percent vacancy rate; negligible use of contractors; six institutions filled all positions; three institutions had vacancy rates under 10 percent; ten institutions had vacancy rates between 13 and 50 percent; three institutions had vacancy rates of 57 percent, 71 percent, and 75 percent, respectively, and three institutions did not fill their recreational therapist positions.
> - Office techs: 33 percent vacancy rate; use of contractors reduced functional vacancy rate to 32 percent. Five institutions had full coverate; twenty-one institutions had vacancy rates from 14 to 50 percent; four institutions had vacancy rates ranging from 56 to 67 percent; and two institutions, each with a .5 position, had no office tech.

Twenty–Fifth Round Report (ECF No. 4248) at 52–56.

49. The staffing shortages referred to in two of these review appear to be shortages of custody staff (¶ 6g) and medical staff (¶ 9c).

50. In addition, in their objections to the Special Master's Twenty–Fifth Round Report reserved for consideration on this motion, defendants challenge the requirement that clinical vacancy rates not exceed ten percent; object to "the special master's conclusion that mental health clinical staff positions were established because CDCR mental health deemed they were clinically necessary to meet the needs of the inmate population", contending instead that the staffing allocation plan " 'represents a comprehensive, optimal staffing model with regard to CDCR's mental health program needs' " that is subject to reexamination and revision; and contend that no particular staffing rate is mandated by the Constitution. Amended Defendants' Objections

sory assertion is belied by substantial evidence in the record, including the fact that as of the end of November 2012 defendants had a vacancy rate approaching 30% in staffing levels that defendants themselves have represented are "appropriate" to "meet constitutional standards," (ECF No. 4325), which exceeds the vacancy reported by the Special Master from data gathered through September 11, 2012, and by findings of defendants' own experts.

To meet the requirements of the Eighth Amendment, defendants are required to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Coleman v. Wilson*, 912 F.Supp. at 1306 (quoting *Balla*, 595 F.Supp. at 1577). The Clinical Experts' Report tendered by defendants with their termination motion (ECF No. 4275–5), does not show that defendants have "sufficient numbers" of mental health staff in place. Even if it were proper for defendants to back away from the 2009 Staffing Plan, they have not met their burden of proving that they can

meet their constitutional obligations with the existing levels of staffing vacancies.[51] To the contrary, defendants' experts themselves describe worrisome staffing vacancies and significant negative impacts of those vacancies on the delivery of mental health care. Clinical Exp. Rpt. (ECF No. 4275–5) at 13–15.

For example, defendants' experts report that at Salinas Valley State Prison, "[t]he mental health director expressed concerns regarding staffing and space shortages" and the defense experts "were especially concerned with the number of psychiatrists on staff there." *Id.* at 14. Concerns regarding mental health staffing shortages were also reported to the defense experts at Pelican Bay State Prison; at California Men's Colony, where staff reported that the shortages "adversely impacted their ability to provide care to inmates"; and at the Substance Abuse Treatment Facility (SATF), where "mental health staff reported dramatic mental health staffing shortages." *Id.* at 15. Defendants experts found the staffing shortages at SATF "particularly apparent for recreational

and Motion to Strike or Modify Portions of the Twenty–Fifth Round Monitoring Report of the Special Master, filed February 19, 2013 (ECF No. 4347) at 23.

Defendants' current objections to the Special Master's findings concerning staffing shortages bear a striking resemblance to their objections to the Magistrate Judge's 1994 findings concerning constitutionally inadequate staffing levels. Here, defendants contend: (1) they do have mental health staff; (2) the Constitution does not specify the specific number of staff required; and (3) their staffing allocation plan is designed to provide optimal staffing. Then, they contended: (1) they did have mental health staff; (2) the magistrate judge failed to specify a constitutional minimum number of staff; and (3) a staffing plan in a consultants' report offered at trial exceeded constitutional minima. *See Coleman*, 912 F.Supp. at 1306.

Moreover, the evidence tendered by defendants to support their current specific objec-

tions consists of "comments" by one of their experts, Dr. Joel Dvoskin. Dvoskin Comments Regarding Twenty–Fifth Round Report, filed February 19, 2013 (ECF No. 4347–1). Dr. Dvoskin reports that he was asked by defendants' counsel to "offer [his] initial impression of the 25th Round Monitoring Report of the Special Master." *Id.* at 3. Dr. Dvoskin's "impression" of the Special Master's Report is of no utility to the matters at bar. Indeed, his only relevant comment is that he was leaving the assessment of the quality of psychiatric services being provided to another defense expert, Dr. Scott. *Id.* at 7.

**51.** As discussed above, evidence cited by the United States Supreme Court showed that a previous staffing plan was inadequate Defendants represented to the state legislature that the 2009 Staffing Plan would meet their constitutional obligations. As described in the text, defendants have failed to show how they can meet their constitutional obligations by retreating from the current plan.

therapy and psychiatry" and that "[d]ue to significant psychiatric staffing shortages, psychiatrists were not present for many Interdisciplinary Treatment Team meetings, with the exception of the Mental Health Crisis Bed Unit" even though they are "essential members of the treatment team and should be present." *Id.* These findings mirror the conclusion of the Special Master in his Twenty–Fifth Round Monitoring Report.

In short, defendants have not met their initial burden of showing that seriously mentally ill inmates in the CDCR no longer face substantial risk of serious harm due to significant shortages in mental health staffing. Chronic understaffing continues to hamper the delivery of constitutionally adequate medical care and is a central part of the ongoing constitutional violation in this action.

### 6. *Deliberate Indifference*

Relying on the opinion of their experts, defendants contend that they are no longer acting with deliberate indifference to the serious mental health needs of the plaintiff class. *See, e.g.*, Termination Motion (ECF No. 4275–1) at 11. (citing Clinical Ex. Rpt. at 2, 8). The court is not persuaded that defendants have focused on the proper analysis of this factor in this context.

In order to obtain injunctive relief for an Eighth Amendment violation, plaintiffs must present evidence sufficient to give rise to an inference that defendants are "knowingly and unreasonably disregarding an objectively intolerable risk of harm" and that defendants will continue to disregard the risk into the future. *Farmer v.*

*Brennan,* 511 U.S. at 846, 114 S.Ct. 1970. To avoid entry of an injunction, defendants may prove either that they were unaware of the risk of harm or that they have responded reasonably to it. *Id.*

Defendants were found to be deliberately indifferent at the initial phase of these proceedings. Since then, they have been under a series of court orders to develop and implement plans to remedy the serious inadequacies in the delivery of · mental health care to prison inmates. The court also appointed a Special Master whose very purpose, among other things, has been to insure that defendants do not remain deliberately indifferent to their duty to remedy the constitutional violation in this action. Where, as here, defendants were found to be deliberately indifferent in the initial phase of these proceedings, they must either comply with the court-ordered relief to remedy the identified violation or establish that the identified violation has been remedied in another way. They can no longer act in a manner that is deliberately indifferent to the objective violation without risking contempt.

At most, the relevant subjective inquiry turns on the policies defendants have adopted to remedy the harm and the manner and extent to which those policies have been implemented and are being administered. *See Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *see also Hadix v. Johnson,* 367 F.3d 513, 516 (6th Cir.2004) (where court is concerned with "future conduct to correct prison conditions," finding of objectively unconstitutional conditions also satisfies subjective prong because the same information that leads to court's conclusion is also available to prison officials).[52] As

---

**52.** To the extent that defendants contend certain specific steps are not constitutionally required, the argument misses the mark. · "A court may order 'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation'." *Sharp v. Weston,* 233 F.3d 1166, 1173 (9th Cir.2000) (quoting *Toussaint*

*v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir. 1986)). In addition, defendants have the burden of demonstrating that relief ordered by this court exceeds what is necessary to remedy ongoing constitutional violations. *Graves,* 623 F.3d at 1051. Defendants have not met this burden.

discussed above, defendants have either failed to adequately implement and administer necessary components of their suicide prevention program and other critical parts of their remedial plan, the Revised Program Guide, or they have not yet completed tasks essential to full implementation of those component parts of their mental health delivery system. Systemic failures persist in the form of inadequate suicide prevention measures, excessive administrative segregation of the mentally ill, lack of timely access to adequate care, insufficient treatment space and access to beds, and unmet staffing needs. Per *Hadix, supra*, these objectively unconstitutional conditions evidence the subjective component of deliberate indifference.

Further, based on defendants' conduct to date, the court cannot rely on their averments of good faith as a basis for granting termination. There is overwhelming evidence in the record that much of defendants' progress to date is due to the pressure of this and other litigation. While defendants take credit for building the Correctional Health Care Facility (CHCF), which will substantially remedy the ongoing shortages in necessary beds, that project came into existence because of the Receiver in *Plata*. Defendants' current mental health bed plan, current mental health staff plan, and sustainable process for referring inmates to necessary inpatient care were the result of numerous court orders and years of effort by the Special Master, defendants, and plaintiffs' counsel.

In light of the foregoing, I am satisfied that outstanding orders for prospective relief remain necessary to correct current and ongoing violations in the delivery of adequate mental health care to plaintiff class members and extend no further than necessary to correct those violations. I am also satisfied that these orders are narrowly drawn and the least intrusive

means to correct the ongoing violations. The court emphasizes again that the court and the Special Master have been guided throughout the remedial phase of this action by the view that it is the court's obligation to identify constitutional deficiencies and defendants' obligation to remedy them. *See Coleman*, 912 F.Supp. at 1301. The Special Master has been required numerous times to make specific recommendations for further action by defendants to remedy ongoing constitutional violations, and the court has been required numerous times to issue specific orders to defendants to develop and/or implement plans to remedy ongoing constitutional violations. Defendants have had full and fair opportunities to object to each of the Special Master's recommendations, and to litigate fully the propriety of orders issued by the court. They must comply with outstanding court orders and complete remediation of ongoing Eighth Amendment violations in the delivery of mental health care to seriously mentally ill inmates in the state's prison system.

### 7. *Prospective Relief Remains Necessary*

Defendants bear the burden of showing that outstanding orders for prospective relief "exceed[ ] what is necessary to correct an ongoing constitutional violation." *Graves*, 623 F.3d at 1048. Defendants seek termination of all outstanding prospective relief. They have not identified or addressed particular orders for prospective relief which they contend should be set aside.

With their opposition, plaintiffs filed a separate statement of orders issued by this court over the past four years. (ECF No. 4409.) Plaintiffs have identified each outstanding order, as well as those that have expired by their own terms. *Id.* Plaintiffs have also included one or more reasons why outstanding orders remain necessary

and otherwise meet the PLRA standards for prospective relief. *Id.*

The court is satisfied that its outstanding orders for prospective relief remain necessary to correct current and ongoing violations in the delivery of adequate mental health care to plaintiff class members and extend no further than necessary to correct those violations. The court is also satisfied that these are narrowly drawn and the least intrusive means to correct the ongoing violations.

For the foregoing reasons, this court finds that ongoing constitutional violations remain in this action and the prospective relief ordered by this court remains necessary to remedy those violations. Defendants' motion to terminate under the Prison Litigation Reform Act, 18 U.S.C. § 3626(b) will be denied.

II. *Rule 60(b)(5)*

Defendants also move to vacate the judgment of this court and orders for prospective relief pursuant to Fed.R.Civ.P. 60(b)(5) on the ground that they are delivering constitutionally adequate mental health care to the plaintiff class. In relevant part, Rule 60(b)(5) provides for relief from a final judgment or other order on the grounds that "the judgment has been satisfied, released, or discharged; . . . or applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). Defendants contend that the court must "vacate its judgment and orders for prospective relief" because they are delivering constitutionally adequate mental health care. Termination Motion (ECF No. 4275–1) at 31. The court construes this as a request for finding that the judgment has been satisfied and prospective relief is no longer equitable.

For the reasons set forth supra, defendants have not met the "more exacting" standard of 18 U.S.C. § 3626(b) for termination of relief in this action. *See Gil-*

*more,* 220 F.3d at 1007. A fortiori, they are not entitled to relief under Rule 60(b)(5) at this time.

In accordance with the above, IT IS HEREBY ORDERED that defendants' January 7, 2013 motion to terminate this action (ECF No. 4275) is DENIED.

IT IS SO ORDERED.